Gregory HAMILTON, and Dana
Hamilton, plaintiffs,

v.

Larry YORK d/b/a HLT Check Exchange,
LLP, defendant.

No. Civ.A. 97–361.

United States District Court,
E.D. Kentucky.

Dec. 11, 1997.

Addison Parker, Appalachian Research & Development Fund, Richmond, KY, Stephen A. Sanders, Deborah A. Schmedemann, Appalachian Research & Defense Fund of Ky., Inc., Prestonsburg, KY, Ned Pillersdorf, Pillersdorf, DeRossett & Barrett, Prestonsburg, KY, Ned Pillersdorf, Pillersdorf, DeRossett & Barrett, Prestonsburg, KY, for Plaintiffs.

J. Clarke Keller, Daniel E. Danford, Stites & Harbison, Lexington, KY, for Defendant.

## MEMORANDUM OPINION
## AND ORDER

HOOD, District Judge.

The defendant, Larry York D/B/A HLT Check Exchange, LLP ("HLT"), has moved the Court [Record No. 4] to dismiss the plaintiffs' claims. The plaintiffs, Gregory and Dana Hamilton ("Hamiltons"), have responded [Record No. 7], to which HLT has

replied [Record No. 8]. This matter is now ripe for decision.

The following are the pertinent facts. On August 22, 1996, the Hamiltons began doing business with HLT, a licensed check cashing company, in Pikeville, Kentucky. The Hamiltons engaged in two types of transactions with HLT: (1) "check cashing" transactions, and (2) "deferral" transactions.

The following is how the "check cashing" transactions worked. The Hamiltons would give HLT a document in the form of a check in exchange for cash. HLT agreed to hold the "check" for two weeks before presenting it for payment or before requiring the Hamiltons to "pick up" the check by paying the face amount. HLT's charge for cashing and holding the check for two weeks was 20% of the sum advanced. The Hamiltons' incurred the 20% charge for the use of HLT's money and the ability to delay the payment of the check.

In the "deferral" transactions, upon the expiration of two weeks, HLT would allow the Hamiltons to defer presentment of their check in exchange for an additional 10% of the sum originally advanced for each week of deferral. The "deferral" fees were incurred by the Hamiltons in order to have more time to pay off their original "check". The Hamiltons allege that HLT knew or reasonably should have known that at the time of the "check cashing" and "deferral" transactions that they did not have sufficient funds in the bank to cover the checks given to HLT.[1] Based on the above facts, the Hamiltons have made numerous claims against HLT, and HLT has moved to dismiss all of them.

■ The case of *LRL Properties v. Portage Metro Housing Authority*, 55 F.3d 1097, 1104 (6th Cir.1995) sets out the applicable law on motions to dismiss pursuant to Fed. R.Civ. P. 12(b)(6):

> " 'A complaint should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " (citation omitted)

"A complaint need only give 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir.1993).

■ One of the Hamiltons' first claims involves Kentucky's Interest and Usury Statutes, KRS 360.010–.020. In order to state a claim under KRS 360.020, a person must knowingly take, receive, reserve, or charge a rate of interest greater than is allowed in KRS 360.010. Based on the above facts, the Hamiltons claim that HLT charged a 520% annual interest rate, which more than exceeds the rate allowed in KRS 360.010.

HLT, relying heavily on the check cashing statutes, argues that it was not charging interest but only service fees for cashing checks.[2] The pertinent check cashing provision, KRS 368.100(2), states that:

> Any fee charged by a licensee for cashing a check shall be disclosed in writing to the bearer of the check prior to cashing the check, and the fee shall be deemed a service fee and not interest.

The Hamiltons, however, argue that their "check cashing" and "deferral" charges were incurred in exchange for extra time to pay back their original check, not fees for cashing a check.

■ In analyzing this issue, the Court notes the case of *Hurt v. Crystal Ice & Cold Storage Co.*, 215 Ky. 739, 286 S.W. 1055, 1056–57 (1926). In *Hurt*, the court stated that:

> "The cupidity of lenders, and the willingness of borrowers to concede whatever may be demanded or to promise whatever may be exacted in order to obtain temporary relief from financial embarrassment, as would naturally be expected, have resulted in a great variety of devices to evade the usury laws; and to frustrate such evasions the courts have been compelled to look beyond the form of a transaction to its substance, and they have laid it down as an inflexible rule that the mere form is immaterial, but that it is the sub-

---

1. If the Hamiltons had enough money in the bank to cover the amount they were asking for plus 20%, they would not have needed to borrow any money from HLT.

2. It should be emphasized that whether HLT's charges are considered to be interest or service fees is the central issue behind all of the Hamiltons' claims, both state and federal.

stance which must be considered. No case is to be judged by what the parties appear to be or represent themselves to be doing, but by the transaction as disclosed by the whole evidence; and, if from that it is in substance a receiving or contracting for the receiving of usurious interest for a loan or forbearance of money the parties are subject to the statutory consequences, no matter what device they may have employed to conceal the true character of their dealings."

*Id.*, 286 S.W. at 1056–57 (citation omitted). In looking at the substance of the transactions between the Hamiltons and HLT, as opposed to the form, the Court finds that the transactions were nothing more than interest bearing loans. HLT was not cashing the Hamiltons' checks, but rather, it was giving them short-term loans that could be deferred for an additional 10% per week. *See Harding v. Kentucky Title Trust Co.*, 269 Ky. 622, 108 S.W.2d 539, 548–49 (1937) (noting that a loan is usurious if it is in bad faith and is meant to conceal usury).[3]

■ It also seems clear that KRS 368.100(2) was written so there would be no confusion that if a person walked into a check cashing establishment with a government check for $1,000 and the business gave him $900 for the check that the business would not be subject to usury statutes because the $100 payment would be a service fee, not discounted interest. The above $100 charge is considered a *service* fee because the business is not receiving the $100 for the use of its money, but rather the service of process-

ing and providing instant cash to unbanked people.

Moreover, a well-known legal dictionary defines "loan" as "[d]elivery by one party to and receipt by another party of sum of money upon agreement, express or implied, to repay it with or without interest." Black's Law Dictionary 844 (5th ed.1979). It goes on to define "interest" as "the compensation allowed by law or fixed by the parties for the use or forbearance or detention of money." *Id.*, at 729. Based on the above definitions, it is clear that the charges incurred by the Hamiltons were interest from short-term loans, not service fees.[4]

HLT also argues that the legislative intent behind KRS 368.100 encompasses short-term loans. The Court notes, however, that HLT cannot cite any substantive authority for this proposition.[5] Additionally, if HLT's interpretation of KRS 368.100(2) was correct, "check cashing" companies would not have to stop with short-term loans they could make long-term loans as long as it was under the guise of cashing a check.[6] Therefore, based on the above analysis, the Hamiltons' claims under Kentucky's Usury statute will not be dismissed.[7]

■ The Hamiltons also assert claims under the Kentucky Consumer Loan Act, KRS 288.991. They allege that the interest and fees charged by HLT exceeded the limitations of Chapter 288. HLT, once again, argues that KRS 368.100(2) prevents the charges from being considered interest. As

---

**3.** The Court notes that HLT cites *Harding* in support of its proposition. However, the transactions between the Hamiltons and HLT were short-term loans without any *independent* consideration for the exorbitant fees. For example, the fees incurred in performing a title search on real estate that was going to be pledged as security for a loan would be independent consideration; hence, they would be deemed service fees, not interest.

**4.** It is hard to imagine how charges for exchanging money today for more money at a later date could be classified as anything but interest on a loan when the transactions do not include a sale of property.

**5.** Although the Court reviewed the affidavit from Rick Jones, Acting General Counsel for the Department of Financial Institutions, it does not find Jones's affidavit to be persuasive. Since

Jones is advising the check cashing companies in Kentucky to engage in short-term deferred loans, it is not surprising that he believes what he is saying is legal. However, his opinion is unpersuasive considering his constituents are the check cashing companies, and his opinion does not correlate to the true substance of KRS 368.100(2).

**6.** It should be noted that the language in KRS 368.100(2) is general.

**7.** Surely, the Kentucky legislature did not intend for businesses to be able to "get around" the usury statute and charge exorbitant interest rates by simply obtaining a "check cashing" license. However, if this is what the legislature wanted, it will have to clarify its intentions.

noted above, the Court rejects this argument; hence, the Hamiltons' claims under the Kentucky Consumer Loan Act will not be dismissed.[8]

■ As to the Hamiltons' claims under the Civil RICO statute, 18 U.S.C. § 1964(c), it is clear that they have alleged the necessary facts. For instance, 18 U.S.C. § 1962(b) states that:

It shall be unlawful for any person through a pattern of racketeering activity *or* through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Additionally, 18 U.S.C. § 1961(6)(B) states that:

"unlawful debt" means a debt ... (B) which was incurred in connection with the business of gambling in violation of the laws of the United States, a State, or political subdivision thereof, *or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate....*

The Hamiltons have alleged that HLT charged a 520% interest rate. It is also clear that the Hamiltons are alleging that HLT attempted to collect their debt in order to carry on and maintain its enterprise.[9] Therefore, the Hamiltons' civil RICO claims will not be dismissed.

■ In regard to the claims under the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1640, et seq., and Regulation Z, it is clear that the Hamiltons have alleged sufficient facts to state a claim. The Hamiltons allege that the defendant failed to disclose the terms of their transactions, such as the 520% annual rate, in the manner required by TILA. The defendant argues that it did not have to conform to TILA because the transactions were not covered by the statute. This argument ignores the nature of the deferred-repayment transactions and does not reflect the broad wording of TILA or its underlying policy.

For example, 15 U.S.C. § 1602 states that:

(e) The term "credit" means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.

(f) The term "creditor" refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness...

Furthermore, 15 U.S.C. § 1605(a) broadly defines "finance charge" as:

the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit.... Examples of charges which are included...

(1) Interest, time price differential, and any amount payable under a point, discount, or other system of additional charges

(2) Service or carrying charge.

(3) Loan fee, finder's fee, or similar charge.

(4) Fee for an investigation or credit report.

(5) Premium or other charge for any guarantee or insurance protecting the creditor....

(6) Borrower-paid mortgage broker fees, including fees paid directly to the broker or lender (for delivery to the broker) whether such fees are paid in cash or financed.

---

8. Given the potentially lengthy duration of these deferred-repayment transactions and the cumulative effect of the fees, consumers are entitled to the protection of Kentucky's Usury statute and other state and federal laws.

9. Although it is not necessary for the Hamiltons to allege two predicate acts because they are going under the unlawful debt section of the statute, the Court notes that the Hamiltons claim that they had at least twenty-five transactions with HLT.

The deferred-repayment transactions between the Hamiltons and HLT involved payments by the Hamiltons of substantial sums of money over time for the privilege of obtaining cash from HLT today. Thus, since the Hamiltons were incurring debt and deferring its payments, these transactions would fall under the language in 15 U.S.C. § 1602(e)–(f). Additionally, the alleged fees paid by the Hamiltons to the defendant would be considered finance charges under the broad definition in 15 U.S.C. § 1605(a).[10]

■■ The Hamiltons also claim that HLT disguised their consumer loan business as a check cashing operation, failed to disclose their interest rates and finance charges, and threatened criminal prosecution for writing bad checks when HLT had to have known that the Hamiltons could not have been prosecuted for failing to pay usurious loans. Based on the above charges and other false statements that the Hamiltons allegedly relied on to their detriment, the Hamiltons have made out claims for fraud, deceit, and misrepresentation. Furthermore, the above allegations are also sufficient to state a claim under the Kentucky Consumer Protection Act, KRS 367.110–.310.

■ Finally, HLT argues that the Hamiltons named the wrong party, and the case should be dismissed. It argues that the real party in interest is "HLT Check Exchange, LLP," not Larry York D/B/A HLT Check Exchange, LLP. The defendant, however, did not allege that it was prejudiced by the alleged misnomer. Hence, the Court will allow the Hamiltons to file an amended complaint if they have made an error. Accordingly,

**IT IS ORDERED** that the defendant's motion to dismiss [Record No. 4] be, and the same hereby is, **DENIED.**

---

**10.** It should be noted that HLT's fees would be considered "finance charges" in connection with an "extension of credit" under TILA.